RECORD NOS. 14-1737(L); 14-1776 (XAP)

In The

# United States Court of Appeals

### For The Fourth Circuit

# MONSANTO COMPANY,

*Plaintiff – Appellee/Cross-Appellant,*

**v.**

# ARE-108 ALEXANDER ROAD, LLC,

*Defendant – Appellant/Cross-Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

––––––––––––––

## BRIEF OF APPELLANT/CROSS-APPELLEE

––––––––––––––

Mark E. McKeen
PAUL HASTINGS LLP
55 Second Street, 24th Floor
San Francisco, California  94105
(415) 856-7000

Joseph H. Stallings
HOWARD, STALLINGS, FROM
 & HUTSON, P.A.
Post Office Box 12347
Raleigh, North Carolina  27605
(919) 821-7700

*Counsel for Appellant/Cross-Appellee*          *Counsel for Appellant/Cross-Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE OF CORPORATE AFFILIATIONS

## AND OTHER INTERESTS

**Nos. 14-1737(L) and 14-1776,**

**Monsanto Company v. ARE –108 Alexander Road, LLC**

Pursuant to FRAP 26.1 and Local Rule 26.1, ARE –108 Alexander Road, LLC ("ARE") who is Appellant, makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?

   ☐YES ☒NO

2. Does party/amicus have any parent corporations?

   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:                                    ☒YES ☐NO

   Alexandria Real Estate Equities, Inc.
   ARE-QRS Corp.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
   If yes, identify all such owners:                                    ☐YES ☒NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
   If yes, identify entity and nature of interest:                                    ☐YES ☒NO

i

5.   Is party a trade association? (amici curiae do not complete this question)

     If yes, identify any publicly held member whose stock or equity value could
     be affected substantially by the outcome of the proceeding or whose claims
     the trade association is pursuing in a representative capacity, or state that
     there is no such member:                          ☐YES ☒NO

6.   Does this case arise out of a bankruptcy proceeding?
     If yes, identify any trustee and the members of any creditors'
     committee:                                        ☐YES ☒NO


     Dated:  September 29, 2014

                              By: /s/ Mark E. McKeen
                                  Mark E. McKeen
                                  *Counsel for Appellant*
                                  *ARE –108 Alexander Road, LLC*

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATION
AND OTHER INTERESTS ...................................................................i

TABLE OF CONTENTS........................................................... iii

TABLE OF AUTHORITIES ........................................................v

JURISDICTIONAL STATEMENT ..........................................1

STATEMENT OF THE ISSUES....................................................1

STATEMENT OF THE CASE, RELEVANT FACTS, PROCEDURAL
HISTORY, AND IDENTIFICATION OF RULINGS PRESENTED FOR
REVIEW ...........................................................................2

     A.    Statement of The Case.........................................................2

     B.    Relevant Facts, Procedural History, and Identification of
          Rulings Presented for Review .............................................4

SUMMARY OF ARGUMENT .................................................9

STANDARD OF REVIEW ....................................................11

ARGUMENT ...............................................................13

     I.    THE DISTRICT COURT ERRED BY NOT DENYING OR
          CONTINUING MONSANTO'S MOTION FOR SUMMARY
          JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL
          PROCEDURE 56(d) SO THAT ARE-108 COULD CONDUCT
          REQUESTED DOCUMENT AND DEPOSITION
          DISCOVERY FROM MONSANTO REGARDING THE
          PROPER INTERPRETATION OF (AND AMBIGUITIES
          WITHIN) THE 1A, 1B AND 1C LEASES AND
          AMENDMENTS THERETO ............................................13

II.    AT A MINIMUM, THE RELEVANT LEASE PROVISIONS AND AMENDMENTS WERE SUFFICIENTLY AMBIGUOUS SUCH THAT THE DISTRICT COURT ERRED IN GRANTING MONSANTO'S MOTION FOR SUMMARY JUDGMENT AT SUCH AN EARLY PROCEDURE STAGE ...................................................................20

    A.    Under North Carolina Law, Where Lease Terms are Ambiguous, Conflict, Susceptible to More Than One Reasonable Meaning, or Require Explanation, Evidence of Prior Negotiations are Admissible to Aid in Determining How the Terms Were Used by the Parties to the Transaction .......................................................................21

    B.    Under North Carolina Law, Even if Words in a Lease Seem Clear and Unambiguous, a Latent Ambiguity Exists if Their Meaning is Less than Certain when Viewed in the Context of all the Surrounding Circumstances, and Evidence of Negotiations May be Considered to Ascertain the Actual Intent of the Parties..........24

    C.    At a Minimum, There are Latent or Other Ambiguities in the Relevant Lease Provisions Between the Parties Which Would Preclude Summary Judgment for Monsanto at Such an Early Procedure Stage, and Prior to ARE-108's Requested Discovery regarding the Proper Interpretation of the Disputed Issues ........................................26

CONCLUSION ........................................................................................32

LOCAL RULE 34(a) STATEMENT ....................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alchemy Commc'ns Corp. v. Preston Dev. Co.*,
  148 N.C. App. 219 (N.C. Ct. App. 2002)..........................................21, 22, 24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................15

*Atlantic Disc. Corp. v. Mangel's*,
  2 N.C. App. 472 (1968) ............................................................................22

*Burks v. American Cast Iron Pipe Co.*,
  212 F.3d 1333 (11th Cir. 2000) ...............................................................13

*Carmical v. Bell Helicopter Textron, Inc.*,
  117 F.3d 490 (11th Cir. 1997) .................................................................13

*Burlington N. Santa Fe R.R. Co. v.*
*Assiniboine & Sioux Tribes of the Fort Peck Reservation*,
  323 F.3d 767 (9th Cir. 2003) ...................................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................14, 19

*Charlotte Hous. Auth. v. Fleming*,
  123 N.C. App. 511 (1996) ........................................................................21

*Cleland v. The Children's Home, Inc.*,
  64 N.C. App. 153 (1983) ..........................................................................22

*Dep't. of Transp. v. Idol*,
  11 4 N.C. App. 98 (1994) .........................................................................21

*Evans v. Techs. Applications & Serv. Co.*,
  80 F.3d 954 (4th Cir. 1996) .....................................................................14

*First Chicago Int'l. v. United Exch. Co.*,
    836 F.2d 1375( D.C. Cir. 1988) .......................................................17

*Garrett v. City of County of San Francisco*,
    818 F.2d 1515 (9th Cir. 1987) ........................................................13

*Goodman v. Resolution Trust Corp.*,
    7 F.3d 1123 (4th Cir.1993) ...........................................................12

*Harrods Ltd. v. Sixty Internet Domain Names*,
    302 F.3d 214 (4th Cir. 2002) ...........................................15, 16, 17, 18

*Idol v. Little*,
    100 N.C. App. 442 (1990) .............................................................22

*Ingle v. Yelton*,
    439 F.3d 191 (4th Cir. 2006) .....................................................15, 17

*Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*,
    898 F.2d 946 (3rd Cir. 1990) .........................................................16

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
    939 F.2d 1257 (5th Cir. 1991) .......................................................17

*Jefferson-Pilot Life Ins. Co. v. Smith Helms Mulliss & Moore*,
    110 N.C. App. 78 (1993) .......................................................21-22, 24

*Lane v. Scarborough*,
    284 N.C. 407 (1973) ..................................................................25

*Metabolife Int'l, Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) .....................................................14-15

*Miller v. Green*,
    183 N.C. 652, 112 S.E. 417 (1922) ..................................................24

*Mosley & Mosley Builders, Inc. v. Landin, Ltd.*,
    87 N.C. App. 438 (N.C. Ct. App. 1987)...........................................23, 24

*Myers v. Myers*,
    714 S.E.2d 194 (N.C. Ct. App. 2011)......................................................12, 24

*Nguyen v. CAN Corp.*,
    44 F.3d 234 (4th Cir. 1995) ........................................................14

*Root v. Allstate Ins. Co.*,
    272 N.C. 580 (N.C. 1968) ...........................................23, 24, 25

*Rowe v. Rowe*,
    305 N.C. 177 (N.C. 1982) ........................................................23

*Sames v. Gable*,
    732 F.2d 49 (3d Cir. 1984) ........................................................17

*Saunders v. Branch Banking and Trust Co.*,
    526 F.3d 142 (4th Cir. 2008) ........................................................12

*Seabulk Offshore, Ltd. v. American Home Assurance Co.*,
    377 F.3d 408 (4th Cir. 2004) ...........................................11, 12

*Snook v. Trust Co. of G. Bank of Savannah*,
    859 F.2d 865 (11th Cir. 1988) ........................................................13

*Starling v. Still*,
    126 N.C. App. 278 (1997) ........................................................18

*Strader v. Sunstates Corp.*,
    129 N.C. App. 562 (1998) ........................................................25

*Strag v. Bd. Of Trs.*,
    55 F.3d 943 (4th Cir. 1995) ...........................................17, 18

*Temple Co. v. Guano Co.*,
    162 N.C. 87 (1913) ........................................................21

*Visa Int'l Servs. Ass'n v. Bankcard Holders of Am.*,
    784 F.2d 1472 (9th Cir. 1986) ........................................................15

*World-Wide Rights Ltd. P'ship v. Combe Inc.*,
955 F.2d 242 (4th Cir. 1992) ...................................................................11, 12

**STATUTES**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

N.C. Gen. Stat. section 6-21.2 ...............................................................8

N.C. Gen. Stat. section 6-21.2(2) ...........................................................8

**RULES**

Fed. R. Civ. P. 26 ...............................................................................19

Fed. R. Civ. P. 56 ...............................................................................12

Fed. R. Civ. P. 56(d) ...................................................................*passim*

Fed. R. Civ. P. 56(f) ...............................................................13, 16, 17

**OTHER AUTHORITIES**

10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane,
*Federal Practice & Procedure* § 2741 (3d ed. 1998)...............................18

30 Am. Jur. 2d, § 1069...........................................................................23

32 Am. Jur., Landlord and Tenant, § 127 ...............................................22

## JURISDICTIONAL STATEMENT

Appellant ARE-108 Alexander Road, LLC ("ARE-108") appeals a final money judgment of the U. S. District Court for the Middle District of North Carolina.  The district court entered an original judgment on June 23, 2014, and amended judgment on July 22, 2014, in favor of Appellee Monsanto Company ("Monsanto").  ARE-108 filed a notice of appeal of the original judgment on July 21, 2014, and an amended notice of appeal of the amended judgment on July 24, 2014.

The district court had jurisdiction under 28 U.S.C. § 1332.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by not denying or continuing Monsanto's motion for summary judgment pursuant to Fed. R. Civ. P. 56(d) so that ARE-108, as landlord, could conduct previously requested document and deposition discovery from Monsanto, as tenant, and any third parties as regarding the proper interpretation of (and ambiguities within) the 1A, 1B and 1C leases and amendments thereto?

2.      Whether the district court erred by granting Monsanto's motion for summary judgment finding that it was unambiguous that Monsanto, as tenant,

had no obligation to pay Base Rent to ARE-108, as landlord, during the two term extensions under the 1B lease?

       3.    Whether the district court erred by granting Monsanto's motion for summary judgment finding that it was unambiguous that ARE-108, as landlord, was not entitled to take any adverse action against Monsanto, as tenant, for failing to pay Base Rent during the two term extensions under the 1B lease?

       4.    Whether the district court erred by granting Monsanto's motion for summary judgment finding that it was unambiguous that Monsanto, as tenant, was entitled to return of all Base Rent, late fees, and pre-judgment interest paid under protest to ARE-108, as landlord, under the 1B lease?

## STATEMENT OF THE CASE, RELEVANT FACTS, PROCEDURAL HISTORY, AND IDENTIFICATION OF RULINGS PRESENTED FOR REVIEW

**A.**    **Statement of The Case**

       Appellant ARE-108, as landlord, and appellee Monsanto, as tenant, are parties to three leases for commercial premises in Research Triangle Park in North Carolina.  The three leases, as amended, are referenced as the "1A Lease" (108 Alexander Drive), the "1B Lease" (110 TW Alexander Drive), and the "1C Lease" (112 TW Alexander Drive).  Beginning in 2010, a lease interpretation dispute arose between Monsanto and ARE-108 relating to rental payments owed by Monsanto under the 1B Lease beginning in November 2010 pursuant to a term

2

extension option.  Ultimately, Monsanto paid "under protest" to ARE-108 the disputed November 2010 rent (including late charges) and thereafter Monsanto continued to pay disputed monthly rent to ARE-108 through mid-2014.

In conjunction with this lease interpretation dispute, in November 2010 Monsanto filed a Complaint for declaratory relief against ARE-108 as regarding the rent owed by Monsanto under the 1B Lease.  Thereafter, in April 2011, ARE-108 served Monsanto with its First Request for Production of Documents, specifically seeking Monsanto's documents relating to the negotiations, letters of intent, internal and external communications, and working files of six (6) key Monsanto witnesses regarding the proper interpretation of (and ambiguities within) the 1A, 1B and 1C Leases at issue between ARE-108 and Monsanto, as well as requested the availability of seven (7) Monsanto witnesses for deposition.

In response, Monsanto entirely refused to produce any requested documents and/or make any Monsanto witnesses available for deposition.  Instead, in April 2011, Monsanto filed a motion for summary judgment with the Court regarding its purported interpretation of the parties' underlying lease agreements. Ultimately, in June 2013, the district court issued an order granting Monsanto's motion for summary judgment and requesting briefing on whether attorneys' fees should be awarded under the applicable facts and law.  After such review of such

3

briefing, in June 2014 the district court issued an order denying Monsanto's request for an award of attorneys' fees in its entirety.

Also in June 2014, the district court entered a judgment which incorporated its prior orders granting Monsanto's motion for summary judgment and denying Monsanto's request for attorneys' fees.  In July 2014, this judgment was amended to state the monetary judgment amount to be $2,023,915.24 in favor of Monsanto and against ARE-108.

In June 2014, and thereafter in July 2014, ARE-108 timely appealed the judgment and amended judgment.  In August 2014, Monsanto cross-appealed as to amended judgment, but only to the portions of the judgment that denied Monsanto's request for an award for attorneys' fees.

**B.    Relevant Facts, Procedural History, and Identification of Rulings Presented for Review**

As noted above, ARE-108, as landlord, and Monsanto, as tenant, are parties to three commercial leases in Research Triangle Park, which as amended are referenced as the "1A Lease" (108 Alexander Drive), the "1B Lease" (110 TW Alexander Drive), and the "1C Lease" (112 TW Alexander Drive).  JA-I-220-465.  The leases relate to three interconnected buildings that includes office, laboratory, warehouse, and automated greenhouse space that pertain to Monsanto's research.  Beginning in 2010, a complex, interrelated lease interpretation dispute – in the range of approximately $2,400,000 to $4,800,000 in future rent at issue – arose

4

between Monsanto and ARE-108 relating to payments owed by Monsanto under the 1B Lease beginning November 1, 2010, as evidenced by correspondence and/or notices between Monsanto and ARE-108 dated April 9, 2010, April 28, 2010, June 9, 2010, November 15, 2010 and November 17, 2010. JA-I-27, 29-30, 32-38, 40-41, 43-44. Ultimately, as stated in Monsanto's letter dated November 17, 2010, Monsanto paid "under protest" to landlord ARE-108 the disputed November 2010 rent (including late charges) of $40,919.75, and thereafter Monsanto continued to pay disputed monthly rent to ARE-108 of $38,484.18/month (and did so from December 2010 through mid-2014, with such rent increasing annually). JA-I-43-44.

In conjunction with this dispute, on November 19, 2010, Monsanto filed a Complaint for declaratory relief against ARE-108 as regarding the rent owed under the 1B Lease. JA-I-14-44. Thereafter, on April 5, 2011, ARE-108 served Monsanto with its First Request for Production of Documents, specifically seeking Monsanto's documents relating to the negotiations, letters of intent, internal and external communications, and working files of six (6) key Monsanto witnesses regarding the 1A, 1B and 1C Leases at issue between ARE-108 and Monsanto. JA-I-146-155. After serving these document demands, on April 14, 2011, ARE-108's counsel sent correspondence to Monsanto's counsel stating that "[f]ollowing receipt of Monsanto's response and production of documents, my

5

client wishes to commence taking a limited number of depositions in this case" and requesting the availability of the following Monsanto witnesses for deposition – David Kelpe, Mark Weavil, Janice Edwards, Steve Padgette, Teresa Crossland, Asha Lundell, and Michael ("Mick") Hauser.  JA-I-157.

In response, Monsanto entirely refused to produce any requested documents and/or make any Monsanto witnesses available for deposition.  Instead, on April 22, 2011, Monsanto filed its "motion to stay discovery" wherein Monsanto requested that the district court grant a protective order staying all of ARE-108's pending document demands and requested depositions "pending resolution" of Monsanto's motion for summary judgment.  JA-I-87-107.

On April 6, 2011, Monsanto filed a motion for summary judgment with the district court regarding its purported interpretation of the parties' lease agreements.  JA-I-58-86.  In response, on May 9, 2011, and without receipt of any requested discovery from Monsanto, ARE-108 opposed (with two supporting declarations) the motion for summary judgment as (1) subject to a Fed. R. Civ. P. 56(d) denial or continuance so that ARE-108 could conduct previously requested document and deposition discovery from Monsanto as regarding the proper interpretation of (and ambiguities within) the 1A, 1B and 1C Leases and amendments thereto, and (2) subject to denial at this early procedural stage given the sufficiently ambiguous language in the underlying leases and amendments

thereto, such that discovery should be permitted as regarding the proper interpretation and intent of the interrelated lease provisions (and lease amendments) in dispute between the parties, among other arguments. JA-I-108-170.

On March 25, 2013, after the passage of many months, Magistrate Judge L. Patrick Auld issued the "Memorandum Opinion/Recommendation" regarding Monsanto's motion for summary judgment, wherein it was recommended that said motion for summary judgment be granted and that judgment be entered against ARE-108. JA-II-466-478. On April 10, 2013, ARE-108 timely objected to the Memorandum Opinion/Recommendation, and requested that the district court make a *de novo* determination upon the record as well as ARE-108's pending discovery requests. JA-II-479-498. On April 29, 2013, Monsanto responded to ARE-108's objection. JA-II-499-614.

On June 27, 2013, the district court issued an order adopting the Magistrate Judge's recommendation that Monsanto's motion for summary judgment be granted, and (1) judgment be entered that (a) Monsanto had no obligation to pay Base Rent during the two Term Extensions under the Lease; (b) Monsanto is not in default for failing to pay such Base Rent; (c) ARE-108 is not entitled to take any adverse action against Monsanto for any failure to pay Base Rent; and (d) Monsanto is entitled to the return of all Base Rent, late fees, and

interest paid under protest to ARE-108; (2) judgment be entered awarding monetary damages for all amount of Base Rent and related charges paid under protest by Monsanto in connection with the Lease, plus prejudgment interest on the amount of that award; and (3) judgment will be entered awarding Monsanto its attorneys' fees and costs pursuant to Section 44(k) of the Lease as permitted by N.C. Gen. Stat. section 6-21.2(2). Further, the district court ordered that ARE-108 and Monsanto submit briefs on the attorneys' fees issue as regarding the proper application of N.C. Gen. Stat. section 6-21.2(2) to the existing facts and lease documents, and detailed specific questions to be addressed by the parties. JA-II-615-619.

On August 1, 2013, ARE-108 filed its brief in response to the district court's questions and analysis regarding any award of attorneys' fees as permitted by N.C. Gen. Stat. section 6-21.2 in this case, and requested that no fees be awarded in this case given such analysis. JA-II-620-637. Also on August 1, 2013, Monsanto filed its brief regarding attorneys' fees, and requested that certain fees be awarded. JA-II-638-681.

After review of such briefing, on June 23, 2014, the district court issued a memorandum opinion and order stating that, for the reasons set forth in the order, Monsanto's request for an award of attorneys' fees was denied in its entirety. JA-II-705-724.

Also on June 23, the district court entered a judgment which incorporated its prior orders dated June 17, 2013 and June 23, 2014 wherein Monsanto's motion for summary judgment was granted and Monsanto's request for an award of attorneys' fees was denied. JA-II-725-726. On June 23, 2014, ARE-108 timely filed a notice of appeal of said judgment. JA-II-727-729.

On July 22, 2014, the district court entered an amended judgment wherein it specifically ordered that monetary damages are awarded to Monsanto in the total amount of $2,023,915.24. JA-II-730-731. On July 24, 2014, ARE-108 timely filed an amended notice of appeal of the amended judgment. JA-II-732-734.

On August 4, 2014, Monsanto cross-appealed as to the amended judgment, but only to the portions of the judgment that denied Monsanto's request for an award of attorneys' fees. JA-II-735-737.

## SUMMARY OF ARGUMENT

In a case involving the interpretation of, and interrelation between, three lengthy, "options to renew" leases for commercial premises in Research Triangle Park involving tenant Monsanto's office, laboratory, warehouse and automated greenhouse space, landlord ARE-108 only requests that all relevant evidence and documents be considered by the district court in order to fully ascertain the parties' actual intent and proper interpretation of certain ambiguous

lease provisions regarding Monsanto's current and future rent obligations to ARE-108. However, the district court's rulings and proceedings failed to provide ARE-108 with an opportunity to fully defend and oppose Monsanto's interpretation of the 1B Lease, and the court erred in granting Monsanto's motion for summary judgment and entering monetary judgment against ARE-108.

First, the district court erred by not denying or continuing Monsanto's motion for summary judgment pursuant to Fed. R. Civ. P. 56(d) so that ARE-108 could conduct previously requested document and deposition discovery from Monsanto regarding the proper interpretation of (and ambiguities within) the parties' 1A, 1B and 1C Leases and amendments thereto. If ARE-108 had been permitted to conduct such discovery, to which Monsanto refused to produce, ARE-108 would have been able to provide the district court with its full and complete arguments in opposition to Monsanto's motion for summary judgment, which motion was later granted by the court absent a complete record.

Second, the district court erred in granting Monsanto's motion for summary judgment at such an early procedural stage given the sufficiently ambiguous language in the relevant leases and amendments thereto – which again discovery should have been permitted as regarding the proper interpretation and intent of the interrelated lease provisions in dispute between Monsanto and ARE-108. Under North Carolina law, even if words in a lease seem clear and

10

unambiguous (which is not present here), a latent ambiguity exists if their meaning is less than certain when viewed in the content of all the surrounding circumstances, such that evidence of negotiations may be considered to ascertain the actual intent of the parties and meaning of the lease provisions.  In this case, at a minimum, there are latent or other ambiguities in the relevant lease provisions that would preclude summary judgment at such an early procedural stage, including conflicting language within the Second Amendment to the 1B Lease (as compared with prior lease provisions) as well certain of the parties' negotiations leading up to the Second Amendment.  Specifically, there is at least a triable issue as to whether the purpose and intent of the parties' Second Amendment to the 1B Lease was to continue the existing or "current" Base Rent through the first two extension periods, i.e., "through 2020", leading up to the additional, post-2020 extension periods granted in the Second Amendment.

## STANDARD OF REVIEW

As applied to this case, "[a] court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).  The usual rule is easy to state.  This Court reviews "*de novo* a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party." *Seabulk*

*Offshore*, *Ltd. v. American Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004); *Saunders v. Branch Banking and Trust Co.*, 526 F.3d 142, 147 (4th Cir. 2008). The analysis is slightly nuanced in a contract case, however.

"*Only* an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible of two reasonable interpretations.'" *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245 (citation omitted; emphasis added). Thus, the "first" step for a court is to examine the contract "to determine whether, as a matter of law, the contract is ambiguous… on its face." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993). Because the "district court is no better position than an appellate court to decide such an issue," and because "[t]he interpretation of a written contract is a question of law that turns upon a reading of the document itself," this Court also reviews the contract "*de novo*." *Seabulk Offshore*, *Ltd. v. American Home Assur. Co.*, 377 F.3d at 418; *see also Myers v. Myers*, 714 S.E.2d 194, 198 (N.C. Ct. App. 2011) ("Our review of a trial court's determination of whether a contract is ambiguous is *de novo*.").

Further, a district court's denial of a Rule 56(d)[1] motion for continuance to obtain affidavits or discovery is reviewed for abuse of discretion.

---

[1] Fed. R. Civ. P. 56(d) was amended in 2010 and "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note.

*Carmical v. Bell Helicopter Textron, Inc.*, 117 F.3d 490, 493 (11th Cir. 1997);

*Burks v. American Cast Iron Pipe Co.*, 212 F.3d 1333, 1336 (11th Cir. 2000).  But

when the district court has failed to rule on a Rule 56(d) motion, or grants

summary judgment without addressing outstanding discovery issues, appellate

courts have not hesitated to find abuse of discretion.  *See Snook v. Trust Co. of G.*

*Bank of Savannah*, 859 F.2d 865, 871 (11th Cir. 1988) (reversing grant of

summary judgment and remanding for district court to rule on motion to compel

discovery); *see also Garrett v. City of County of San Francisco*, 818 F.2d 1515,

1518 & n. 3 (9th Cir. 1987) (failure to rule on Rule 56(f) motion is failure to

exercise discretion and is reviewed *de novo*).

## ARGUMENT

I.  **THE DISTRICT COURT ERRED BY NOT DENYING OR
    CONTINUING MONSANTO'S MOTION FOR SUMMARY
    JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL
    PROCEDURE 56(d) SO THAT ARE-108 COULD CONDUCT
    REQUESTED DOCUMENT AND DEPOSITION DISCOVERY
    FROM MONSANTO REGARDING THE PROPER
    INTERPRETATION OF (AND AMBIGUITIES WITHIN) THE 1A, 1B
    AND 1C LEASES AND AMENDMENTS THERETO**

    In its opposition to Monsanto's motion for summary judgment, ARE-

108 requested (as supported by two Declarations) that Monsanto's motion be

denied or continued under Fed. R. Civ. P. 56(d) so that ARE-108 could take

previously requested document and deposition discovery from Monsanto – which

discovery has been completely stonewalled by Monsanto.  JA-I-112-116, 126-170.

13

In ultimately granting Monsanto's motion for summary judgment without permitting ARE-108 to conduct any such discovery, the district court denied ARE-108 an opportunity to present a full defense or opposition to Monsanto's motion.

The purpose of Fed R. Civ. P. 56(d) is to prevent the opposing party from being "'railroaded' by a premature motion for summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). For this reason, motions for summary judgment made before the opposing party has had reasonable opportunity for investigation and discovery are dealt with under Fed. R. Civ. P. 56(d). *Nguyen v. CAN Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (Rule 56(d) requires that "summary judgments be refused where the non-moving party has not had the opportunity to discover information that is essential to his opposition").

Pursuant to Rule 56(d), if the opposing party presents affidavits or declarations showing reasons why it cannot present facts essential to its opposition, the Court may either (1) defer considering the motion or deny it, (2) continue the hearing to allow additional time to obtain affidavits or to take discovery, or (3) issue some other appropriate order for relief. Indeed, the law is well settled that granting summary judgment prior to the completion of all discovery is generally inappropriate. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996); *Celotex Corp.*, 477 U.S. at 322 (summary judgment is appropriate only "after adequate time for discovery"); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d

832, 846 (9th Cir. 2001) (although Fed. R. Civ. P. 56(d) "facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'") (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 n.5 1986)).  As such, a nonmovant must place the court on notice of why summary judgment is premature.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 246 (4th Cir. 2002) (reversing and remanding, in part, and holding that summary judgment was granted prematurely as the nonmovant had conducted little to no discovery and had not been dilatory in seeking discovery).  A court may not deny a Rule 56(d) application for a continuance where the party opposing summary judgment makes (1) a timely application which (2) specifically identifies (3) relevant information, (d) where there is some basis for believing that the information sought actually exists.  *Ingle v. Yelton*, 439 F.3d 191, 196 (4th Cir. 2006) (reversing, in part, and holding that the trial court abused its discretion in granting summary judgment before certain discovery had been completed) (citing *Visa Int'l Servs. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986)).

15

Therefore, if discovery is necessary for the opposing party to demonstrate genuine issues of material fact, then an affidavit should be filed which declares that a proper opposition to a motion for summary judgment cannot be made "without a chance to conduct discovery." *Harrods Ltd.*, 302 F.3d at 244. Moreover, as in this case, where "no discovery whatsoever has taken place, the party making a Rule 56(f) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not yet been laid." *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 774 (9th Cir. 2003) ("Lightning-quick summary judgment motions can impede informed resolution of fact-specific disputes."). Moreover, where essential facts are in the moving party's exclusive possession, a Fed. R. Civ. P. 56(d) motion for continuance "should be granted almost as a matter of course." *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3rd Cir. 1990).

More narrowly, where "the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and where fact-intensive issues, such as *intent*, are involved, courts have not always insisted on a Fed. R. Civ. P. 56(d) affidavit if the "nonmoving party has adequately informed the district court that the motion is *premature* and that more discovery is necessary." *Harrods Ltd.*, 302 F.3d at 244 (emphasis added).  "Specifically, if the nonmoving

party's objections before the district court 'served as the functional equivalent of an affidavit,' . . . and if the nonmoving party was not lax in pursuing discovery," then a reviewing court may consider whether a grant of summary judgment is premature. *Id.* at 244-45 (quoting *First Chicago Int'l. v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)). For example, the combination of the nonmovant's "opposition to dismissal on the merits, the accompanying Statement of Material Issues, and the outstanding discovery requests served as an adequate substitute for a Rule 56(f) affidavit." *Id.* at 246 (quoting *First Chicago*, 836 F.2d at 1380-81). Thus, by putting the court on notice of the reasons for why summary judgment is premature, a nonmovant may seek a continuance under Fed. R. Civ. P. 56(d). *See id.* at 245.

Further, a Fed. R. Civ. P. 56(d)-based "continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course." *Int'l Shortstop*, *Inc. v. Rally's*, *Inc*., 939 F.2d 1257, 1267 (5th Cir. 1991) (quoting *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984)). Furthermore, "denial of the Rule 56(f) motion is particularly inappropriate when . . . 'the materials sought are the object of *outstanding* discovery.'" *Ingle*, 439 F.3d at 196 (emphasis added) (quoting *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995)). Moreover, courts should "hesitate before denying Rule 56(f) motions when the party opposing summary judgment is attempting to obtain necessary discovery of

information possessed only by" its opponent. *Id.* at 196-97.  In fact, "sufficient

time for discovery is considered especially important when the relevant facts are

exclusively in the control of the opposing party." *Harrods Ltd.*, 302 F.3d at 246-

47 (quoting 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal*

*Practice & Procedure* § 2741, at 419 (3d ed. 1998)).  Additionally, summary

judgment prior to discovery can also be "particularly inappropriate" when a case

involves complex factual questions about intent and motive.  *Id.* at 247.

       In this case, the facts are undisputed that (1) on April 5, 2011, one day

*before* Monsanto's motion for summary judgment was filed, ARE-108 served its

First Request for Production of Documents on Monsanto (JA-I-146-155);

(2) thereafter, on April 14, 2011, and given that Monsanto's response to ARE-

108's document production was due on May 9, 2011, ARE-108's counsel

requested from Monsanto's counsel the deposition availability after May 16, 2011

of seven (7) identified Monsanto witnesses, as well as Monsanto's desired location

for the depositions (JA-I-157); (3) Monsanto completely refused to respond to

ARE-108's served document demands, and further refused to produce its witnesses

for deposition; and instead, on April 22, 2011, Monsanto filed a motion to stay

discovery with the district court (JA-I-87-107); (4) on February 24, 2011, ARE-

108 had previously identified the same seven (7) Monsanto witnesses requested for

deposition when ARE-108 timely provided Monsanto's counsel with its Initial

Disclosures under Fed. R. Civ. P. 26 (JA-I-131-138); and (5) pursuant to the Joint

Rule 26(f) Report, the parties' agreed (and Court ordered) that the "close of

discovery period" would not be until September 15, 2011 (JA-I-140-144).

       As warned in the *Celotex* case above, it was clearly Monsanto's goal

to "railroad" ARE-108 with a motion for summary judgment, and do so without

allowing ARE-108 to conduct any requested document or deposition discovery

from Monsanto and any necessary third parties regarding the negotiations,

discussions, letters of intent and internal communications/files regarding the proper

interpretation of (and ambiguities within) the 1A, 1B and 1C Leases (and

amendments) at issue in this case.  ARE-108's First Request for Production of

Documents was served back on April 5, 2011 (and should have been responded to

by Monsanto on May 9, 2011), and on April 14, 2011 ARE-108's counsel in

writing requested to mutually schedule the depositions of the Monsanto witnesses

after May 16, 2011 (i.e., promptly after receipt and review of Monsanto's produced

documents).  In response, Monsanto refused to allow any discovery and filed a

motion to stay discovery to further deny ARE-108 any discovery in this case.

However, the requested documents to be produced by Monsanto and the requested

depositions of Monsanto witnesses (and any identified third parties) were relevant

to this matter, and would have been used to fully and fairly oppose Monsanto's

motion for summary judgment.  JA-I-146-157.

Accordingly, pursuant to Fed. R. Civ. P. 56(d), the district court erred by not denying or continuing Monsanto's motion for summary judgment so that ARE-108 could conduct previously requested document and deposition discovery from Monsanto and any necessary third parties regarding the proper interpretation of the 1A, 1B and 1C Leases at issue.

## II.  AT A MINIMUM, THE RELEVANT LEASE PROVISIONS AND AMENDMENTS WERE SUFFICIENTLY AMBIGUOUS SUCH THAT THE DISTRICT COURT ERRED IN GRANTING MONSANTO'S MOTION FOR SUMMARY JUDGMENT AT SUCH AN EARLY PROCEDURE STAGE

Alternatively, the district court erred in granting Monsanto's motion for summary judgment at such an early procedural stage given the sufficiently ambiguous language in the relevant leases (and amendments), such that discovery should have been permitted as regarding the proper interpretation and intent of the interrelated lease provisions in dispute between Monsanto and ARE-108.  Under applicable North Carolina law, any parol evidence arising from such requested discovery would have been admissible in, and relevant to, this contract interpretation matter over Monsanto's rent obligations under the 1B Lease.

A.   **Under North Carolina Law, Where Lease Terms are Ambiguous, Conflict, Susceptible to More Than One Reasonable Meaning, or Require Explanation, Evidence of Prior Negotiations are Admissible to Aid in Determining How the Terms Were Used by the Parties to the Transaction**

Section 44(i) of the 1B Lease provides that "[c]onstruction and interpretation of this Lease shall be governed by and construed and enforced in accordance with the internal laws of the state in which the Premises are located . . .", i.e., North Carolina.  Under North Carolina law, one rule of interpretation for leases is that an undefined word in a lease "should be given its natural and ordinary meaning" rather than be interpreted according to "the strict letter," especially if doing so would defeat the "manifest intention" of the lease, as gathered from the whole instrument.  *Alchemy Commc'ns Corp. v. Preston Dev. Co.*, 148 N.C. App. 219, 224-25 (N.C. Ct. App. 2002) (citing *Temple Co. v. Guano Co.*, 162 N.C. 87, 90 (1913) and *Charlotte Hous. Auth. v. Fleming*, 123 N.C. App. 511, 514 (1996)).  Additionally, where a contract provision is plain and unambiguous, the plain language of the agreement controls.  *Dep't. of Transp. v. Idol*, 114 N.C. App. 98, 100 (1994).  However, where a contract provision is ambiguous and the parties' intent is unclear, ambiguities are a matter to be resolved by the jury upon consideration of "the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time."  *Jefferson-Pilot Life Ins. Co. v. Smith Helms Mulliss & Moore*, 110 N.C.

21

App. 78, 82 (1993) (quoting *Cleland v. The Children's Home*, *Inc.*, 64 N.C. App. 153, 157 (1983)).

Given a contractual term that is unclear or ambiguous, North Carolina courts will generally seek to construe the terms in ways that are reasonable and just. *Alchemy Commc'ns Corp.* 148 N.C. App. at 224 (N.C. Ct. App. 2002) ("[T]he court should reject an interpretation of the terms of a lease which would be unreasonable or unequal if this can be done consistently with the tenor of the agreement."). Courts view the adoption of the most just construction available as being "most in accordance with the presumed intention of the parties." *Atlantic Disc. Corp. v. Mangel's*, 2 N.C. App. 472, 477 (1968) (citing 32 Am. Jur., Landlord and Tenant, § 127, p. 130). In so doing, the lease "should be interpreted as a whole and the meaning gathered from the entire contract, and not from particular words, phrases, or clauses." *Starling v. Still*, 126 N.C. App. 278, 281 (1997).

For example, where optional renewal provisions are silent or unclear on the amount of rent due upon renewal, North Carolina courts have looked to the terms of the original lease agreement (and amendments) in resolving the matter. *Idol v. Little*, 100 N.C. App. 442, 445 (1990). And where the terms of the written documents are ambiguous, conflict, susceptible to more than one reasonable meaning, or require explanation, evidence of prior negotiations is *admissible* to aid

the jury in determining how the ambiguous terms were used by the parties. *Rowe v. Rowe*, 305 N.C. 177, 185 (N.C. 1982). Such prior negotiations between the parties are seen as furnishing "the best definition to be applied in ascertaining the intention of the parties." *Root v. Allstate Ins. Co.*, 272 N.C. 580, 588 (N.C. 1968).

In such circumstances, extrinsic or parol evidence may be introduced under North Carolina law to "show what was in the minds of the parties" at the time the written instrument was executed. *Root*, 272 N.C. at 587 (citing 30 Am. Jur. 2d, § 1069). In *Mosley & Mosley Builders*, *Inc. v. Landin*, *Ltd.*, a commercial lease provided for the lease of retail store premises located on the bottom level of a shopping mall, described in the lease as being located in "Phase I," an ambiguous term that later gave rise to a conflict over whether the defendant landlord could require the plaintiff retailer to relocate. *Mosley & Mosley Builders*, *Inc. v. Landin*, *Ltd.*, 87 N.C. App. 438, 439-441 (N.C. Ct. App. 1987). The North Carolina Court of Appeals stated that "[a]n interpretation given a contract by the parties themselves prior to the controversy must be given consideration by the courts in ascertaining the meaning of the language used," and held that extrinsic evidence was admissible to establish the parties' intent as to the meaning accorded to the term "Phase I" as used in the lease agreement. *Id*. at 442 (citations omitted). The court found the trial court's failure to declare and explain the jury's duty to

determine the meaning of "Phase I" was reversible error, and reversed and remanded for a new trial. *Id.* at 445.

**B.    Under North Carolina Law, Even if Words in a Lease Seem Clear and Unambiguous, a Latent Ambiguity Exists if Their Meaning is Less than Certain when Viewed in the Context of all the Surrounding Circumstances, and Evidence of Negotiations May be Considered to Ascertain the Actual Intent of the Parties.**

North Carolina courts may also find a "latent ambiguity . . . where the words of a written agreement are plain, but by reason of extraneous facts the definite and certain application of those words is found impracticable." *Myers v. Myers*, — N.C. App. —, —, 714 S.E.2d 194, 198 (2011), quoting *Miller v. Green*, 183 N.C. 652, 112 S.E. 417, 418 (1922). In other words, "[e]ven though words in a lease seem clear and unambiguous, a latent ambiguity exists if their meaning is less than certain when viewed in the context of all the surrounding circumstances." *Alchemy Commc'ns Corp. v. Preston Dev. Co.*, 148 N.C. App. 219, 224, 558 S.E.2d 231, 234 (2002); *Jefferson-Pilot Life Ins. Co.*, 110 N.C. App. at 81-82. Where such latent ambiguity arises, evidence of preliminary negotiations between the parties and the surrounding circumstances may be considered in order to ascertain the intent of the parties. *Miller*, 183 N.C. at 655. In *Root v. Allstate Insurance Company*, the North Carolina Supreme Court found that although the words of a lease agreement describing the property were plain and intelligible, it was uncertain whether the basement of the building was included in the terms of

24

the written lease.  The appeals court held that the courts below had erred in barring

parol testimony as to prior negotiations, which did not contradict or vary the terms

of the lease but rather showed the intent of the parties as to whether the entire

building – including the basement – was to be included in the lease.  *Root*, 272

N.C. at 588.

Likewise, a contract necessarily "encompasses not only its express

provisions but also all such implied provisions as are necessary to effect the

intention of the parties unless express terms prevent such inclusion."  *Strader v.*

*Sunstates Corp.*, 129 N.C. App. 562, 569 (1998).  As stated by the Court in

*Strader*, citing *Lane v. Scarborough*, 284 N.C. 407, 410 (1973), an

> ". . . intention or meaning in a contract may be
> manifested or conveyed either expressly or *impliedly*, and
> it is fundamental that that which is plainly or necessarily
> *implied* in the language of a contract is as much a part of
> it as that which is expressed.  If it can be plainly seen
> from all the provisions of the instrument taken together
> that the obligation in question was within the
> contemplation of the parties when making their contract
> or is necessary to carry their intention into effect, the law
> will imply the obligation and enforce it.  The policy of
> the law is to supply in contract what is presumed to have
> been inadvertently omitted or to have been deemed
> perfectly obvious by the parties."  *Id.* at 569 (emphasis
> added); *see also Bicycle Transit Auth. v. Bell*, 314 N.C.
> 219, 227 (1985) (the "heart of a contract is the intention
> of the parties, which is to be ascertained from the
> expressions used, the subject matter, the end in view, the
> purpose sought, and the situation of the parties at the
> time").

**C.    At a Minimum, There are Latent or Other Ambiguities in the Relevant Lease Provisions Between the Parties Which Would Preclude Summary Judgment for Monsanto at Such an Early Procedure Stage, and Prior to ARE-108's Requested Discovery regarding the Proper Interpretation of the Disputed Issues.**

In this case, Monsanto's position regarding Base Rent owed (or not owed) under the 1B Lease during the first two extension periods beginning in November 2010 primarily relies upon the language of Section 41(a) of the original Lease dated April 3, 2000, while ARE-108's position regarding Base Rent owed during that same period primarily relies upon the language of Sections 1(a) and 4(e) of the Second Amendment to Lease dated November 14, 2007 (the "Second Amendment").  JA-I-221-312, 329-334.

First, as regarding the Second Amendment to the 1B Lease (as executed on Monsanto's behalf by Steve Padgette, Vice President, Biotechnology), Section 1 is titled "Additional Right to Extend Term" and specifically addresses Monsanto's additional option rights to extend the lease term beyond year 2020 (the "Additional Extension Right", i.e., presuming that Monsanto exercises its two existing 5-year extension options under the original Lease).  JA-I-329-330.  Under Section 1(a) of the Second Amendment, the parties agreed that Monsanto could exercise its option to so further extend only "on the same terms and conditions as this Lease (other than Base Rent) by giving" written notice to landlord ARE-108 as specified.  JA-I-329.  By the specific reference to the existence of Base Rent at the

time of the potential exercise of the Additional Extension Right in 2020, the

Second Amendment clarifies that Base Rent is being paid by Monsanto to ARE-

108 immediately prior to the exercise of any Additional Extension Right.  Further,

pursuant to Section 3(a) of the original 1B Lease, the parties defined "Base Rent"

as monthly payments by Monsanto to ARE-108 in the sum of $26,250.00, or

$315,000.00 annually, as adjusted going forward.  JA-I-222.  The Base Rent

schedule for the first relevant extension period commencing November 1, 2010,

and ending October 31, 2015, is set forth in ARE-108's letter to Messrs. Grable

and Weavill of Monsanto dated April 9, 2010.  JA-I-170.

     Second, and more specifically, the next paragraph under Section 1(a)

of the Second Amendment provides in pertinent part:

> Upon the commencement of any Additional Extension
> Term, Base Rent shall be payable at the Market Rate (as
> defined below). . . . As used herein, "Market Rate" shall
> mean the then market rental as determined by Landlord
> and agreed to by Tenant, which shall in no event be **less
> than the Base Rent payable _as of the date immediately
> preceding_ the commencement of such Additional
> Extension Term** increased by 103% multiplied by such
> Base Rent. . . ."  (Emphasis added.)  JA-I-329.

     Third, the fact that the Second Amendment provides for the existence

of – and Monsanto's payment of – Base Rent "immediately preceding the

commencement of such Additional Extension Term" is further evidenced by the

parties' negotiations leading up to the execution of the Second Amendment.  In

June 2007, the parties discussed in written correspondence that the initial term of the new "Greenhouse Premises" lease, absent earlier termination, would be November 30, 2024; as a result, the parties also discussed that the 1A and 1B Leases should likewise be extended to remain co-terminus with the Greenhouse Premises lease. JA-I-158-159. On July 12, 2007, as part of negotiations between David Kelpe of Monsanto and Oliver Sherrill of Monsanto regarding the Second Amendment, Mr. Kelpe proposed the following additional, post-2020 renewals for the 1A and 1B premises, as follows:

> Lease Renewals for the 1A and 1B Premises – 2 – 10 year renewals, followed by 1 - 4 year renewal at the greater of Fair Market Value or 103% of the ***then*** **current Base Rent**. 1A and **1B rent payments will be as stated in the *current* 1A and 1B leases *through* 2020**. (We need language added that if the 1A and 1B lease terms are extended, there is no increase in the rent **Monsanto pays from what is provided in the *current*** 1A and **1B leases**.) (Emphasis added.) JA-I-159, 162-163.

Soon thereafter, the parties entered into a Letter of Intent regarding the 1A Lease and the Second Amendment to the 1B Lease dated July 25, 2007 (and executed on Monsanto's behalf by Steve Padgette on August 1, 2007). JA-I-159, 165-168. That Letter of Intent makes absolutely no mention that Base Rent is not owed under the 1B Lease "through 2020" (as Monsanto now claims); instead, it provides that rent payments will continue on through 2020 in the same amount as stated in the "current" 1B Lease, as follows in pertinent part:

> Additional Lease Renewals Existing Premises. In addition to the existing lease renewal options outlined in section 41 of the Lease dated August 1, 2006 (the 1A Lease) and section 41 of the Lease dated August 3, 2000 as assigned to Monsanto by that Assignment and Assumption Agreement dated March 23, 2005 (the 1B Lease) as amended, **Landlord agrees to amend the** 1A Lease and **1B Lease to provide for** 2 – 10 year and 1 – 4 year renewal options at the greater of Fair Market Value or **103% of the *then* current Base Rent** upon no less than 9 months and not more than 12 months prior written notice from Tenant. 1A and **1B rent payments *will* be as stated in the *current* 1A** and **1B leases *through* 2020**. Base Rent for the 2nd 10 year term extension and the 4 year term extension will be greater of fair market value or 103% of base rent . . . (Emphasis added.) JA-I-159, 166.

Specifically, the first sentence above makes reference to the retention of "the existing lease *renewal options* outlined in . . . section 41 of the [1B Lease], as amended." JA-I-159, 166. The reference to *only* "renewal options" (as opposed to renewal options *and* rent payments during those extension periods, and given that ARE-108's "agree[ment] to amend the . . . 1B Lease" as to rent payments is *independently* addressed thereafter) makes clear that the parties intended to retain the "renewal option" period rights in Section 41 but separately modify the rent payments owed during those first two extension periods. The next sentence then gives further definition to the amended rent payments during the Section 41 extension term (i.e., Nov. 2010 through Oct. 2020), while again making absolutely no mention at all of any free Base Rent under section 41, as follows:

"1A and 1B rent payments *will* be as stated in the *current* 1A and 1B Leases

*through* 2020".  JA-I-159, 166.

Given that as of November 14, 2007 (i.e., the date of the Second

Amendment to the 1B Lease) the "current," then existing 1B Lease required

Monsanto to pay Base Rent to ARE-108, the above sentence further evidences the

parties' intent that the rent payments *through* 2020 would be the same Base Rent

as being paid by Monsanto under the *current* 1B Lease.  Said another way, the only

1B rent payments that could be "stated" would be the "current" 1B rent payments

as of November 2007.  Moreover, this parol evidence establishes that Base Rent

through the 2020 extension period was to be paid, and thus is consistent

with Section 1(a) of the Second Amendment to the 1B Lease (specifically, the

language "which shall in no event be *less* than the Base Rent *payable as of the date*

*immediately preceding* the commencement of such Additional Extension

Term . . .").  JA-I-329.

Moreover, in further support of ARE-108's contractual interpretation,

Section 4(e) of the Second Amendment of the 1B Lease provides in full:

> Except as amended and/or modified by this Second
> Amendment, the Lease is hereby ratified and confirmed
> and all other terms of the Lease shall remain in full force
> and effect, unaltered and unchanged by this Second
> Amendment.  In the event of **any *conflict* between** the
> provisions of this Second Amendment and the provisions
> of the Lease, **the provisions of this Second Amendment
> *shall* prevail**.  Whether or not **specifically amended** by

30

this Second Amendment, all of the terms and provisions of the Lease are *__hereby amended__* **to the extent *__necessary__*** **to give effect to the *__purpose__* and *__intent__* of this Second Amendment.** (Emphasis added.) JA-I-333.

Thus, the parties agreed in the 1B Lease that in the case of "any *conflict* between the provisions" of the Second Amendment (as relied upon by ARE-108) and the provisions of the underlying lease (as relied upon by ARE-108), the provisions of the Second Amendment would "prevail" or control regarding contractual interpretation. JA-I-333. Further, the last sentence of Section 4(e) expressly states that even if not "specifically amended" by the Second Amendment, all of the terms and provisions of the lease "are hereby *amended* to the *extent necessary* to give effect to the purpose and intent of this Second Amendment." (Emphasis added.) JA-I-333.

In this case, and upon review of the totality of documentary and parol evidence, the "purpose and intent" of the parties' Second Amendment to the 1B Lease was to continue the existing or "current" Base Rent through the first two extension periods, i.e., "through 2020", leading up to the additional, post-2020 extension periods granted in the Second Amendment. Section 4(e) of the Second Amendment also makes clear that "in the event of any conflict" between the terms of the Second Amendment and the original Lease, the terms of the Second Amendment "shall prevail" over the original Lease. Further, as regarding the parties' intent regarding the Second Amendment, Section 4(e) provides that

31

"whether or not specifically amended" by the Second Amendment, "all of the terms of provisions of the Lease are hereby amended to the extent necessary to give effect to the purpose and intention of this Second Amendment." Given the above, and at a minimum, the district court erred in granting Monsanto's motion for summary judgment given the sufficiently ambiguous language in the underlying leases (and amendments), such that document and deposition discovery should have been permitted as requested by ARE-108 as to the extensive, detailed negotiations leading up to the execution of the Second Amendment, among other matters.

Accordingly, the district court erred in granting Monsanto's motion for summary judgment and entering a monetary judgment in favor of Monsanto given the latent ambiguities in the lease documents, and without ARE-108 being permitted to pursue its requested document and deposition discovery regarding the proper interpretation of (and ambiguities within) the 1A, 1B and 1C Leases and amendments thereto.

## CONCLUSION

The portion of the final amended judgment granting Monsanto's motion for summary judgment and monetary award of $2,024,115.24 should be vacated, and this matter remanded back to the district court for discovery proceedings as previously requested by ARE-108 in this lease interpretation case.

32

## LOCAL RULE 34(a) STATEMENT

Pursuant to Local Rule 34(a), ARE-108 respectfully requests oral argument given the procedural and substantive arguments at issue in this appeal, and believes that oral argument would assist the Court's consideration of this matter.

Respectfully submitted,

/s/ Mark E. McKeen
Mark E. McKeen
**PAUL HASTINGS LLP**
55 Second Street, 24th Floor
San Francisco, CA 94105-3441
Telephone: (415) 856-7000
markmckeen@paulhastings.com

Joseph H. Stallings
**HOWARD, STALLINGS, FROM &
HUTSON, P.A.**
P.O. Box 12347
Raleigh, NC 27605-2347
Telephone: (919) 821-7700
jstallings@hsfh.com

*Attorneys For Defendant*

*Attorneys For Defendant*

September 29, 2014

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*7,682*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 29, 2014          /s/ Mark E. McKeen
                                                   *Counsel for Appellant/Cross-Appellee*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 29th day of September, 2014, I caused this Brief of Appellant/Cross-Appellee and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jason G. Idilbi
Scott M. Tyler
Jonathan M. Watkins
MOORE & VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina  28202-4003
(704) 331-1000

David E. Fox
MOORE & VAN ALLEN
430 Davis Drive, Suite 500
Research Triangle Park, North Carolina  27709

*Counsel for Appellee/Cross-Appellant*

I further certify that on this 29th day of September, 2014, I caused the required copies of the Brief of Appellant/Cross-Appellee and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Mark E. McKeen
*Counsel for Appellant/Cross-Appellee*